JUSTICE COTTER
delivered the Opinion of the Court.
¶1 Donald Cates (Cates) appeals the denial of his motion to dismiss in the Tenth Judicial District Court. We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
¶2 On September 16,2005, a woman contacted the Lewistown Police Department to report that her 16-year-old daughter, S.C., had been raped. S.C. was subsequently interviewed by the police. Initially she stated that she did not know the person who raped her, but later stated that Cates forced her to have sexual intercourse without her consent and had penetrated her. On September 17, 2005, Cates was interrogated by Officer Stacy Danzer (Officer Danzer) at the Lewistown Police Department about these allegations. Cates was 17 years old at the time. Prior to the interrogation, Officer Danzer advised Cates of his Miranda rights but did not properly advise him of his right to parental notification under § 41-5-331(l)(b), MCA, which reads as follows:
When a youth is taken into custody for questioning upon a matter that could result in a petition alleging that the youth is either a delinquent youth or a youth in need of intervention, the following requirements must be met:
(b) The investigating officer, probation officer, or person assigned to give notice shall immediately notify the parents, *40 guardian, or legal custodian of the youth that the youth has been taken into custody, the reasons for taking the youth into custody, and where the youth is being held. If the parents, guardian, or legal custodian cannot be found through diligent efforts, a close relative or friend chosen by the youth must be notified.
¶3 The interrogation between Officer Danzer and Cates was videotaped. During the interrogation, Cates signed a written waiver of his Miranda rights and agreed to speak with Officer Danzer. However, Cates also told Officer Danzer that he wished to speak with his parents during the interview. In spite of this request, Officer Danzer continued with the interrogation of Cates, and Cates made several statements which were potentially incriminating.
¶4 On September 19, 2005, Cates was charged in Fergus County District Court with one count of sexual intercourse without consent. Subsequent investigation of Cates led the police to believe that Cates had committed the offense of sexual intercourse without consent on multiple occasions against a total of 5 teenage girls, including S.C. Accordingly, the Fergus County Attorney filed an Amended Information on October 31, 2005, charging Cates as an adult with 10 counts of sexual intercourse without consent, and one count of attempted sexual intercourse without consent.
¶5 One of the alleged victims was K.K., a female who was 15 years old at the time of the alleged crime. Two of the sexual intercourse without consent charges were based on alleged offenses committed against her on April 17, 2005, and May 1, 2005. Two of the other sexual intercourse without consent charges were based on acts purportedly committed against S.C. on September 16, 2005. After the alleged sexual crimes had been committed against S.C. on that date, she underwent a forensic rape exam at the Central Montana Medical Center. The rape kit containing evidence from this exam was subsequently delivered to Officer Danzer. On September 17,2005, the police also recovered a used condom from K.K.’s residence which had been allegedly used by Cates in the rape of S.C. The condom was also delivered to Officer Danzer.
¶6 A jury trial was eventually scheduled for December 4,2006. Cates was represented by attorneys Torger Oaas (Oaas) and R. Allen Beck (Beck). Previously, on January 10, 2006, this Court decided State v. McKee, 2006 MT 5, 330 Mont. 249, 127 P.3d 445. In McKee, we held that failure of law enforcement to comply with § 41-5-331(l)(b), MCA, requires the suppression of any statements made by a youth during custodial interrogation. McKee, ¶ 26. Even though Cates’ counsel could *41 have moved to suppress the videotaped interrogation of Cates in light of McKee, Cates’ counsel did not do so for tactical reasons. As Cates’ counsel later explained, they believed that the videotaped confession was actually exculpatory and that an examination of the videotape would show that Officer Danzer misrepresented statements made by Cates during the interrogation in a police report she later prepared. Cates’ counsel also reasoned it would be better for their defense to play the videotape at trial, than have Cates himself testify.
¶7 During opening statements, the prosecution described to the jury how Cates allegedly raped the five teenage girls referenced in the Amended Information. The prosecution also discussed Cates’ videotaped confession, and referred to portions of the videotape which it argued were incriminating.
¶8 On the morning of day three of the trial, K.K. took the witness stand and testified about her relationship with Cates. K.K. testified that she and Cates dated from February 2005 to September 2005, and that Cates had forced her to have sexual intercourse against her will during course of their relationship. Since the Amended Information only alleged that Cates committed a sexual offense against on K.K. April 17, 2005, and May 1, 2005, Cates’ defense counsel objected that K.K.’s testimony violated M. R. Evid. 404, which prohibits testimony about prior bad acts. The District Court overruled the objection at the time, but granted a request from Cates’ counsel to be heard later outside the presence of the jury on a motion for a mistrial.
¶9 K.K.’s testimony concluded around noon on the third day of trial. After she finished, the District Court dismissed the jury for lunch and heard Cates’ motion for a mistrial. Outside the presence of the jury, Cates noted that the Amended Information charged two counts of sexual intercourse without consent for acts committed on K.K. on April 17 and May 1, 2005. Cates asserted that K.K.’s testimony referenced other instances of forced sexual intercourse between February 2005 and September 2005, while they were dating. Because the State failed to provide the required notice of its intent to introduce evidence of other crimes or bad acts with respect to K.K. pursuant to State v. Just, 184 Mont. 262, 602 P.2d 957 (1979), modified by State v. Matt, 249 Mont. 136, 814 P.2d 52 (1991). Cates argued that the prosecution’s actions constituted “clear cut” reversible error, warranting a mistrial.
¶10 After argument for a mistrial on this basis, Cates then presented a second motion for a mistrial to the District Court. During the State’s direct examination of K.K., the following exchange occurred:
[Prosecution]: What’s the number-one rule that I told you about
*42 testifying?
[K.K.]: Calm down. Don’t talk about Defendant’s prior-[Prosecution]: Well, no that’s not what I am thinking about. I am thinking of telling the truth.
[K.K.]: Yes, the truth, the whole truth, and nothing but the truth.
¶11 Cates argued the prosecution asked this question of K.K. expecting to get the answer she gave, and that such action constituted prosecutorial misconduct as it was improper vouching for the veracity of the witness. Accordingly, Cates argued this action by the prosecution constituted reversible error and an additional ground for a mistrial.
¶12 The Court then recessed for lunch, reconvening at around 1:20 p.m. outside the presence of the jury. At that time, the prosecution team of Fergus County Attorney Thomas P. Meissner (Meissner) and Deputy County Attorney Monte Boettger (Boettger) raised the possibility that a mistrial might be required based on references made to the videotaped confession in their opening statement. Meissner observed to the District Court that the videotaped confession was likely inadmissible under McKee. Meissner indicated that he just realized this the previous evening while watching a redacted version of the videotape which had been prepared for trial by Boettger. Meissner noticed that Cates had requested to speak with his parents during the interrogation by Officer Danzer. Meissner claimed that this “rang a bell” for him and led him that very morning to conduct research on this issue. In the course of his research, he came upon McKee and realized its potential impact on the trial. After discussing the matter, Meissner and Boettger contacted Musselshell/Golden Valley County Attorney Kent Sipe (Sipe), whom they knew personally from the time that he served in the Fergus County Attorney’s Office, for assistance in researching the legal implications of the videotaped confession on the trial. In particular, Meissner informed the District Court that the State was concerned about the fact that references to the videotaped confession during opening statements by the prosecution would constitute either reversible or plain error in light of the fact that such evidence would be inadmissible against Cates. As reflected in the transcript of the proceedings, the following exchange then occurred among Boettger, Meissner, Oaas, Beck, and the District Court:
MR. MEISSNER: Basically, it appears to us that the confession is inadmissible because [Cates] was not advised of his right to contact his parents, so what Monte [Boettger] and I did we talked *43 about that first thing this morning and called Kent [Sipe] and asked Kent to do some research on it, you know, to see, you know, whether something like that is-of course, you know, we had some comments in opening statements about that, whether or not that would be reversible error, and Allen [Beck] is shaking his head over there.
I don’t know if you guys knew it or not but-but-so that’s really a problem with the record, and I guess in talking about it and I guess in view of the current motion for mistrial I am not sure that we are going to oppose the motion for mistrial.
MR. BOETTGER: If I could add, Your Honor, the problem is, you know, the defense certainly has an obligation to raise motions to suppress evidence and they should have in this case in our view on that, but that isn’t-the fact that they didn’t isn’t a waiver.
THE COURT: Sure.
MR. BOETTGER: That would be-we believe the short research we have been able to get done it would be plainer and would be revealable even if it’s not rape and the problem is if we don’t offer the-we can’t-we don’t believe we can offer that tape but in my own mind I made repeated and detailed references to the Defendant’s alleged confession-all of which we don’t obviously offer any evidence on-is still out there.
THE COURT: Sure. So there is no opposition to the motion for a mistrial?
MR. MEISSNER: Well, I guess we don’t want to-we don’t want to-a sloppy record that’s going to cause that anyway, I guess, and I don’t know. I think there is enough of a concern that maybe that’s the state of it now.
THE COURT: Well, my only-the only reason I made you repeat that is because I-I would prefer that we have a mistrial on an appropriate issue and I just don’t know whether this last issue raised by Mr. Oaas is grounds for a mistrial or not and if we are going to have a mistrial I would rather do it on this basis than one I have not researched or have a, you know, have grounding for.
I don’t know if that makes a big difference in the scheme of things but-Mr. Oaas.
MR. OAAS: I have nothing to say, Your Honor.
THE COURT: All right. Mr. Beck.
MR. BECK: Yes, I have something to say. First... [t]he fact that the State came forward as it has I think only reinforces my opinion that... truly seeking the truth and I want to thank them *44 for it and I appreciate it.
THE COURT: Okay.
MR. MEISSNER: I would say that we did speak with Kent Sipe over the noon hour and he was actually in the Yellowstone County Attorney’s Office with a friend he had down there named Chris and they had been talking about it this morning and gave us some advice and they-they thought that it would be a plain error kind of thing if that confession did come into evidence and the cite is State versus McKee, decided in January of this year, 330 Mont. 249, and I think it pretty clearly says that if the youth is not advised of the right to parental notification any statements made are suppressible.
THE COURT: Okay. All right. I will declare mistrial, and then if there is anything else after we send the jury home that you need to put on the record we will do so. I-I extend the same kudos to you two as Mr. Beck. Once again, you showed fine, professional conduct. I know it’s not easy for you.
¶13 The jury was then dismissed, and the parties reconvened in court. The District Court asked the prosecution if it had anything further to add. The State then requested a scheduling conference and indicated that it would seek to re-file the charges against Cates. Oaas expressed concerns that such action would violate his client’s rights against double jeopardy. The District Court agreed that double jeopardy concerns were potentially present, and advised counsel for both parties to brief the double jeopardy issue.
¶14 Cates subsequently filed a motion to dismiss the Amended Information on double jeopardy grounds. After the issues raised by the motion were fully briefed, the District Court held a hearing on February 14,2007. At the hearing, both sides presented argument and Sipe was called to testify by the State to explain his role in assisting the State with research on the McKee issue. Sipe testified that one of the chief concerns driving his research on the admissibility of the videotape was whether the failure to seek its suppression was a legitimate trial tactic or constituted ineffective assistance of counsel. At any rate, Sipe concluded from his research-and advised the prosecution team-that it would be reversible error for the District Court to continue with the trial of the case under its present posture, given the references to the videotaped confession in opening statements.
¶15 In support of his motion, Oaas made it clear that defense counsel’s failure to move for suppression of the videotape was a trial tactic *45 because: (1) the defense could use the tape in lieu of Cates himself testifying; (2) the videotape would assist in impeaching the testimony of Officer Danzer; and (3) the tape only referenced the “least credible” of Cates’ alleged victims. Furthermore, Oaas argued that the videotape did not actually constitute a confession by Cates, and that Officer Danzer misrepresented the “confessional” nature of the interrogation in an investigative report she prepared. Additionally, Cates argued that the prosecution was simply “goading” Cates into obtaining a mistrial. Oaas argued that the prosecution wanted a mistrial, and a chance to retry Cates on the charges, due to infirmities in its case. These infirmities included the State’s failure to submit either the used condom or the rape kit to the State Crime Lab for testing, the compromised credibility of one of the State’s key witnesses, contradictions in the testimony of Officer Danzer, and the allegation that the State intentionally sought testimony from K.K. concerning Cates’ prior bad acts in violation of M. R. Evid. 404(b) and Just notice requirements.
¶16 On April 2, 2007, the District Court denied Cates’ motion under the authority of State v. Carney, 219 Mont. 412, 714 P.2d 532 (1986). Under this authority, a second criminal trial of Cates would be barred unless there was a “ ‘manifest necessity’ to terminate the trial or [the] defendant acquiesced in the termination.” Carney, 219 Mont. at 417, 714 P.2d at 535. The District Court noted that there were two defense mistrial motions presented to it, and that neither of them was explicitly ruled upon. Instead, the District Court observed that it had wanted to declare a mistrial on an “appropriate issue.” The District Court went on to note that neither party took a definitive stand with respect to the motion for a mistrial, and that the State itself never explicitly moved for a mistrial on the basis of McKee. The District Court then clarified the grounds for the declared mistrial as follows:
The Court’s intent and purpose for declaring a mistrial was to stop a trial which was in a position where the existence of an alleged confession had been repeatedly made known to the jury, yet the evidence about that confession was inadmissible pursuant to McKee. This Court’s observation and conclusion is clearly and convincingly that both sides acquiesced in the Court’s sua sponte declaration of a mistrial. Neither party objected. Because the standards cited above require focus on the Defendant, the Court notes that the Defendant gained what he wanted, with cream on the cake, a mistrial and a tactical advantage regarding possible double jeopardy.
*46 ¶17 The District Court concluded that Cates’ retrial would not be barred under Carney based on his acquiescence to the termination of the proceedings. Even though the District Court concluded that Cates’ acquiescence was sufficient to deny his double jeopardy argument, it then went on to analyze Cates’ motion under the “manifest necessity” standard as well. Under this standard, a trial may be “ ‘discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice.’ ” Carney, 219 Mont. at 417, 714 P.2d at 535 (quoting Wade v. Hunter, 336 U.S. 684, 690, 69 S. Ct. 834, 838 (1949)). In this regard, the District Court concluded that the “particular circumstances surrounding the numerous references to confession and the inadmissibility of that confession created a legal pivot point such that the ends of justice would clearly have been defeated if the trial had continued.” Thus, manifest necessity for a mistrial was present.
¶18 Additionally, the District Court rejected Cates’ argument that he had been “goaded” into a mistrial or that the State was trying to maneuver the court into declaring a mistrial to achieve a second, better opportunity to convict Cates. The District Court found that the prosecution team had acted professionally and that none of the alleged evidentiary infirmities in the prosecution’s case had motivated it to seek a mistrial. Instead, the District Court determined that the “facts and circumstances clearly and convincingly demonstrate that the matter was not a maneuvering but a legitimate, trial-time bomb which the State strongly believed required Court attention and action.” Thus, the District Court concluded that there existed manifest necessity to declare a mistrial, and that this fact as well as Cates’ acquiescence in the proceedings rendered double jeopardy concerns inapplicable.
¶19 Cates now appeals the denial of his motion to dismiss, presenting the following issue on appeal:
¶20 Did the District Court abuse its discretion in declaring a mistrial, and did it err in concluding that Cates’ constitutional right to be free from double jeopardy did not bar his retrial ?
STANDARD OF REVIEW
¶21 A trial court’s decision to declare a mistrial is reviewed for an abuse of discretion. State v. Flores, 1998 MT 328, ¶ 12, 292 Mont. 255, 974 P.2d 124 (citing State v. Moran, 231 Mont. 387, 389, 753 P.2d 333, 336 (1988)). If a trial judge acted rationally and responsibly in declaring a mistrial, we will affirm his or her decision. Flores, ¶ 12.
¶22 A district court’s denial of a motion to dismiss criminal charges on *47 double jeopardy grounds presents a question of law which we review for correctness. State v. Maki, 2008 MT 379, ¶ 9, 347 Mont. 24, 196 P.3d 1281 (citing State v. Cech, 2007 MT 184, ¶ 7, 338 Mont. 330, 167 P.3d 389).
DISCUSSION
¶23 Cates argues that the District Court erred in denying his motion to dismiss. Even though he did initially raise the prospect of a mistrial, Cates asserts that the District Court actually declared a mistrial sua sponte. He also asserts that he did not consent to the mistrial. Accordingly, Cates maintains that the declaration of a mistrial withstands scrutiny only if it is supported by manifest necessity.
¶24 Cates maintains manifest necessity is lacking in this case. He argues that in granting a mistrial the District Court simply bailed out the prosecution from a situation in which it would not be able to produce evidence which it referred to in opening statements, and also provided the State an opportunity to have the rape kit and used condom analyzed by the State Crime Lab. In this connection, Cates asserts that the prosecution’s reference to the videotaped confession in its opening statement was really not that significant as the prosecution only referred to the confession on a limited basis. Instead, the real problem with the case was the prosecution’s failure to have evidence tested for use at trial and properly support its case-a situation which has now been remedied by the declaration of a mistrial and the opportunity to retry Cates on the charges contained in the Amended Information.
¶25 Cates also asserts that any silence or failure to object to the mistrial does not equate to consent, and that because he did not consent to the mistrial, double jeopardy protections prevent him from being prosecuted anew on the charges in the Amended Information. Cates asserts that his position is supported by the weight of authority from other jurisdictions such as State v. Fenton, 506 P.2d 665 (Ariz. App. 2 Div. 1973), Curry v. Sup. Ct. of the City and Co. of San Francisco, 470 P.2d 345 (Cal. 1970), and State v. Werneth, 611 P.2d 1026 (Idaho 1980), which hold that silence or failure to object does not constitute consent to a mistrial.
¶26 The State urges us to affirm, claiming that double jeopardy protections do not bar Cates’ retrial on the charges since manifest necessity to declare a mistrial was present based on the prosecution’s references to the inadmissible videotaped confession during opening statements. The State, citing to Carney, also asserts that the double *48 jeopardy clause does not bar Cates’ retrial because he acquiesced in the termination of the proceedings. In this connection, the State argues that we examined the question of defense acquiescence to a mistrial in Keating v. Sherlock, 278 Mont. 218, 924 P.2d 1297 (1996), and that Keating supports the conclusion that Cates acquiesced to a mistrial under the circumstances of this case. In particular, the State notes that Cates was the party who originally moved for a mistrial and termination of the proceedings. Furthermore, the State asserts that once the District Court made clear its intention to declare a mistrial, Cates was given ample opportunity by the District Court to withdraw his motion for a mistrial, study the matter further, or raise an objection. However, Cates did not avail himself of these opportunities. When given the opportunity to speak, in fact, one defense attorney affirmatively declined to make any objections or express any concerns. In light of these circumstances, the State argues that the District Court’s factual findings that Cates acquiesced to the termination of the proceedings were not clearly erroneous and must be accepted.
¶27 Additionally, the State argues that Cates can be retired for these offenses because he waived his right to object to the termination of the proceedings pursuant to § 46-ll-503(2)(a), MCA. This statute states in pertinent part the following:
(2) A prosecution based upon the same transaction as a former prosecution [which was terminated for reasons not amounting to an acquittal] is not barred when:
(a) the defendant consents to the termination or waives the right to object to the termination ....
Section 46-ll-503(2)(a), MCA (emphasis added).
¶28 Finally, the State urges this Court to reject Cates’ argument that his silence or failure to object to the mistrial was insufficient to constitute acquiescence to the mistrial. The State asserts that the cases relied upon by Cates for this argument are all distinguishable.
¶29 In reply, Cates asserts that Keating is distinguishable and repeats his argument that he did not consent to the District Court’s sua sponte declaration of a mistrial, and that there was not manifest necessity to grant a mistrial. Cates argues a retrial would simply give the State a second, better chance to convict him and to do so would violate his right to be free from double jeopardy.
¶30 The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, and Article II, Section 25 of the Montana Constitution, protect citizens from being placed twice in jeopardy for the same offense. Jeopardy attaches once a jury is sworn and *49 impaneled. Carney, 219 Mont. at 417, 714 P.2d at 535. As the United States Supreme Court has explained,
[underlying this constitutional safeguard is the belief that “the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.”
United States v. Dinitz, 424 U.S. 600, 606, 96 S. Ct. 1075, 1079 (1976) (quoting Green v. United States, 355 U.S. 184, 187-88, 78 S. Ct. 221, 223 (1957)).
¶31 Moreover, when a mistrial has been declared after jeopardy attaches, “the defendant’s ‘valued right to have his trial completed by a particular tribunal’ is also implicated.” Dinitz, 424 U.S. at 606, 96 S. Ct. at 1079 (quoting Wade, 336 U.S. at 689, 69 S. Ct. at 837).
¶32 In this case, there is no question that jeopardy attached to the proceedings against Cates and that a mistrial was declared. Thus, Cates’ right to be free from double jeopardy is clearly implicated. The question is whether Cates’ right against double jeopardy under the state and federal constitutions prevents him from being retired on the charges set forth in the Amended Information.
¶33 In Carney we held that a “second criminal trial is barred unless there was a ‘manifest necessity’ to terminate the trial or [the] defendant acquiesced in the termination.” Carney, 219 Mont. at 417, 714 P.2d at 535 (emphasis added) (citing W. LaFave & J. Israel, Criminal Procedure § 24.1(d) at 901 (1985)). “Manifest necessity” is present when “particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice.” Carney, 219 Mont. at 417, 714 P.2d at 535 (quotation omitted); accord Moran, 231 Mont. at 389, 753 P.2d at 334-35.
¶34 The District Court denied Cates’ motion to dismiss in part on the grounds that he acquiesced to the mistrial. In Keating, we equated acquiescence with “implied consent,” and seemingly endorsed the view that implied consent or acquiescence to the termination of trial proceedings can be inferred from a defendant’s “statements or silences” or a failure to object to the termination. Keating, 278 Mont. at 227-229, 924 P.2d at 1302-03 (discussing United States v. Smith, 621 F.2d 350 (9th Cir. 1980)). As Cates notes, some courts are critical of the notion that “acquiescence” or “mere silence or failure to object to the jury’s discharge” is sufficient to constitute a waiver of double jeopardy *50 protections. See Fenton, 506 P.2d at 667. In fact, LaFave and Israel, the legal progenitors of the “acquiescence” or “implied consent” standard in Montana law, are critical of this approach as well. See Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 25.2(a), 650-51 (2d ed., West 1999) (quotation omitted) (“This readiness of many courts to engraft upon the consent doctrine notions of tacit consent or constructive consent that expand the concept far beyond its justifiable limits has been rightly criticized.”).
¶35 At the same time, other courts have concluded that if the totality of the circumstances and the affirmative conduct of the defendant show that she waived her right to object to the termination of the proceedings, then double jeopardy protections will not bar her retrial. See Werneth, 611 P.2d at 1028; Curry, 470 P.2d at 348; Marshall v. Ohio, 443 F. Supp. 2d 911, 917-18 (N.D. Ohio 2006); see also Peretz v. United States, 501 U.S. 923, 936, 111 S. Ct. 2661, 2669 (1991); In re Shale, 158 P.3d 588, 594 (Wash. 2007); 63 A.L.R.2d 782, § 3[b], 464-65 (West Supp. 2008). More importantly, § 46-ll-503(2)(a), MCA, specifically provides that a prosecution based upon the same transaction as a former prosecution which was terminated for reasons not amounting to an acquittal is not barred if the defendant consents to or waives his or her right to object to the termination of the proceedings. See ¶ 27. Accordingly, if the totality of the circumstances and the affirmative conduct of the defendant show that she waived her right to object to the termination of trial proceedings, then a retrial will not be barred on double jeopardy grounds.
¶36 In the present case, the totality of the circumstances demonstrates that Cates affirmatively waived his right to object to the termination of the proceedings. During the relatively brief colloquy with the District Court, which was initiated by Cates, Cates himself put forth two separate mistrial motions before the District Court declared a mistrial. This conduct demonstrated that he was clearly willing to give up his “valued right to have his trial completed by [the] particular tribunal” which was sworn and impaneled in this case, which right is at the core of the constitutional protection to be free from double jeopardy. See Dinitz, 424 U.S. at 606, 96 S. Ct. at 1079. Furthermore, once the District Court made it clear to all parties that it was granting a mistrial sua sponte on the grounds suggested by the prosecution, the District Court did not attempt to rush the declaration of the mistrial, and specifically gave Oaas and Beck a chance to be heard, or voice an objection. At that point, Cates’ counsel could have withdrawn their previous motions or voiced an objection to the *51 mistrial. Instead, Oaas affirmatively offered that he had nothing to say, and Beck thanked the prosecution team for coming forward. This constitutes an affirmative demonstration, and not mere silence or passive assent that Cates was voluntarily relinquishing his right to proceed before this jury, and waiving his right to object to the termination of the proceedings. See Dinitz, 424 U.S. at 608-09, 96 S. Ct. at 1080. Thus, under § 46-ll-503(2)(a), MCA, his retrial on the charges in the Amended Information is not barred, and the District Court did not err in denying his motion to dismiss.[1]
¶37 Finally, we recognize that the District Court also determined that “manifest necessity” required termination of the proceedings. We conclude that it was unnecessary for the District Court to reach this question in light of the circumstances here presented, and decline to rely upon such grounds for our decision.
¶38 In his Dissent, Justice Leaphart argues that a defendant should not be deemed to waive an objection to a mistrial unless there is “a specific, on-the-record waiver from the defendant himself.” (Leaphart Dissent, ¶ 64). Justice Leaphart also asserts that, contrary to the District Court’s conclusion, the element of manifest necessity is “completely lacking,” and therefore the “acquiescence/consent prong must be all the more compelling; that is consent must be explicit, on-the-record and from the defendant himself.” (Leaphart Dissent, ¶ 67.)
¶39 We note that these arguments were not raised by Cates, either in the District Court or on appeal. Nonetheless, the concerns raised by Justice Leaphart, and similar ones raised by Justice Nelson in his Dissent, are valid. But what makes this case unique and anomalous from a double jeopardy perspective is the fact that Cates had two mistrial motions on the table at the time the District Court decided to declare a mistrial sua sponte-a fact the Dissents tend to ignore. This is the critical factor in our disposition of this matter; were this not so, our decision might indeed be different. Cates’ pending mistrial motions indicate unequivocally that he was giving up his valued right to have the particular tribunal sworn and impaneled in this case try the matter, with the possibility that he would have to face another jury in the future. See United States v. Razmilovic, 507 F.3d 130, 141 (2d Cir. 2007) (quotation omitted) (“[W]hen the defendant requests a mistrial, he is deemed to have deliberately elected to forgo his valued right to have his guilt or innocence determined before the first trier of fact.”).
*52 ¶40 Here, Cates never withdrew his mistrial motions or otherwise indicated to the District Court that he was now changing course and wanted to have the original tribunal determine his guilt. Thus, the situation before the Court is a far cry from those scenarios in which the defendant’s willingness to forgo double jeopardy protections is questionable or unknown. In Razmilovic, for instance, one of two co-defendants in a criminal trial initially requested a mistrial based on a deadlocked jury, but then immediately sought to poll the jury with respect to their deliberations as to his guilt before any mistrial motion was finalized. Razmilovic, 507 F.3d at 141. The trial court hurriedly went ahead with the mistrial nonetheless and did not give co-defendant’s counsel the opportunity to poll the jury or finalize its position with regard to the mistrial. The Second Circuit held that retrial of the co-defendants was barred because counsel’s actions indicated that he was unsure if he really wanted a mistrial after all, and thus the co-defendant did not “deliberately forego[] his right to have his guilt determined by his original tribunal.” Razmilovic, 507 F.3d at 142. Having already twice expressed his willingness to terminate the proceedings by putting forth two mistrial motions, Cates never wavered nor expressed any misgivings, even when given the opportunity to do so. Thus, we conclude that under these particular circumstances Cates waived his right to object to the termination of the proceedings.
CONCLUSION
¶41 We decide this case based solely and specifically upon the circumstances leading to the declaration of the mistrial in this case, including the fact that Cates twice moved for a mistrial during the District Court’s brief colloquy with counsel, and that he affirmatively declined when offered the opportunity to object to the District Court’s declaration of a mistrial. We decline to address here whether silence or passive acquiescence to a mistrial declaration can overcome a defendant’s fundamental right to be free from double jeopardy. We leave this question for a future case, the facts of which place this important constitutional issue squarely before us. Affirmed.
CHIEF JUSTICE McGRATH, JUSTICES WARNER, MORRIS and RICE concur.

 In this connection, it is worth noting that Cates has not challenged the constitutionality of § 46-ll-503(2)(a), MCA, at any point in these proceedings.